The next case on the calendar, Federal Housing Finance Agency, B. Nomura Holding, and we are ready to proceed. Good morning, Your Honors. May it please the Court, David Tulchin from Sullivan & Cromwell, for the Nomura appellants. This appeal is from a judgment of more than $800 million. In a case where the plaintiff not only suffered no actual loss of any significance, but where the plaintiff complained about disclosures that Freddie Mac and Fannie Mae, the investors, never saw, never had, when deciding to purchase the securities. And where the defendants, through numerous rulings of the district court, were not permitted to introduce any evidence that those disclosures, the allegedly false disclosures, were unimportant to a reasonable investor standing in the shoes of these two purchasers. Or evidence showing that Freddie and Fannie themselves never thought that the disclosures had any importance at all. In March 2015, during trial, very close to the outset, the United States Supreme Court issued the Omnicare decision, 135 Supreme Court 1318, which says, among other things, quote, an investor reads each statement within offering documents in light of all of its surrounding text, including hedges, disclaimers, and apparently conflicting information. And further, at 1330, that quote, the investor takes into account the customs and practices of the relevant industry, unquote. This court, earlier this year, 2016, followed Omnicare in tongue against Sanofi, where Judge Parker wrote clearly the context is hugely important in a securities case, saying the context includes an investor's understanding of the subtleties and intricacies of the industry. The result in Sanofi turned on the sophistication of the investors and their understanding of the process employed to obtain FDA approval for a new drug. Not some generic investor who was unsophisticated in the industry, but the sophisticated investors who brought the lawsuit. Well, the fact that Freddie and Fannie may have known that there were difficulties with regard to the originators in compliance with the underwriting guidelines doesn't mean that they couldn't rely upon a representation made by your client that you were representing that the originators had complied with the underwriter guidelines. Knowledge of deviations by the originators, by Freddie or Fannie, doesn't mean that what your client was representing in its prospectus was something that they shouldn't rely on, was it? Your people were supposed to do due diligence. You made a representation. Your client made a representation that these mortgage-backed securities, that all the loans that were contained within them, were in compliance with the underwriting guidelines of the originators. Did it not? No. Actually, not in those words, Judge Wesley. Well, in what words were they? It would surprise me what the words were. The particular sentence at issue, of course, has to be read in context with all the hedges and caveats. The sentence at issue... The associate language that's always put in the on-the-shelf prospectus. That's right. And it was in each of these seven pro-subs. The language in question refers to general compliance with underwriting guidelines. So all the specific representations that follow that, the pages of representations, don't have any meaning then? They have all the meaning in the world. They don't have the meaning that the district court ascribed to them. But if I may, I want to address materiality, and I'd like to start with that if I could, because this court's decision last year in United States against Litvak, it seems to me is absolutely determinative of the issue here. And there's nothing new about Litvak. Twenty-five years ago, this court held in Castellano against Young and Rubicam, an opinion authored by Judge Feinberg, that materiality depends on an inquiry about a reasonable investor, quote, standing in Castellano's shoes, unquote. The Third Circuit has said the same thing in Michaels against Michaels. You're not arguing that materiality isn't ultimately an objective standard? It's an objective standard, yes, I agree, Your Honor. But, Judge Livingston, it's an objective standard with respect to all the circumstances in a given case, including the characteristics of the investors. Okay, so then why is the decision below wrong? Well, there are a number of things, Judge Wesley. Let's start with this. The district court excluded all evidence about what Freddie and Fannie or any other investor standing in their shoes knew about underwriting practices at the time. The district court excluded all evidence that the underwriting practices of these originators, whose loans were purchased by Nomura and securitized, were approved by Freddie and Fannie. The court found it irrelevant that Freddie and Fannie committed to purchase in the aggregate $2 billion worth of RMBS. Excuse me, did they commit to purchase $2 billion worth of bad mortgages? Or did they commit to purchase $2 billion of good mortgages? Your Honor, they committed to purchase before they saw the prosub. That's not an answer. Did they commit without any care with regard to whether they were good or bad? Is that what the government's policy was? No, of course not, Your Honor. Of course not. But there wasn't evidence in the record that there were Freddie and Fannie called no witnesses, FHA called no witnesses from Freddie or Fannie to testify about what was important. Just as in Litvak, where the buyer used a sophisticated computer program to analyze risk before seeing any disclosures, before Litvak made his false statements about, for example, the price that Jeffries had paid for the securities. Just as there, here the district court excluded all the evidence that these buyers used sophisticated computer programs to decide whether or not to buy before the prosubs even issued. Wouldn't that evidence go to Reliance? Not at all. Litvak is very clear about this. And if I may, 808 F-3rd at 185, the sophistication of the investor is relevant to the adequacy of the defendant's disclosure. On materiality, this is at 183 and the same basic statement at 185, the full context and circumstances in which RMBS are traded, including the sophistication of the investor and the fact that the investors ran their own pricing models before the- That excuse is that's a complete defense to 67% of the loans being bad? The loans were not bad, Your Honor. The loans actually- The district court could conclude from Hunter's testimony that they weren't bad to that extent. Only by finding as false disclosures that were never made. For instance, 240 loans, according to Hunter, were defective because they didn't meet minimum industry standards that he created and that exist nowhere other than a litigation-driven expert's creation. The district court also found as false disclosures that were never made about underwriting guidelines. You will recall, for example, that many of the prosups say that for originators below 20%, and this is for 100% of the first prosup because Regulation AB was not then in existence. They represent that the loans met-sorry- were originated generally in accordance with the underwriting criteria described in this section of the prosup. At page- I'm happy about that because I've been thinking about your arguments, that lead argument of yours. I guess I'm not puzzling as to your problem with the district court's analysis. When you read that provision, it seems to say these loans were purchased by the sponsor from all over, from various banks, from various mortgage loan originators, and then they were originated generally in accordance with the criteria described in this section. That seems to me a representation that you can rely on us. We've done an investigation. Reasonable guidelines have been followed from all these various originators. We'll describe those guidelines specifically with regard to those originators that provided more than 20%. For all the others, reasonable guidelines that we're generally describing. How else would you prove that that statement was false except to go back to the guidelines that were used to determine if they were in fact reasonable and if they were in fact complied with? What Hunter did, and the district court followed and blessed this, was not at all to analyze the criteria described in this section, but instead, and Judge Coates said this at page 271 of her opinion, she said that that representation was insufficient to give, quote, to offer to investors that the loans had passed scrutiny, unquote. By declaring the representation to be insufficient, she then rewrote it and decided that that representation should be interpreted exactly as the others, which refer expressly to the originators' guidelines. With all respect. I guess I'm not understanding. It seems to me reasonable, and help me understand what I'm missing. It seems to me to read that provision as saying, rest assured, we've looked into the matter. They were originated pursuant to guidelines that are in keeping with the general terms that are described in this process, and we're talking about how you would go about proving the falsity of that. You have to go back to the specific guidelines that were used and show either that these guidelines are not as generally described in this perspective or that they weren't complied with. Well, Judge Livingston, it doesn't say that they were originated generally in accordance with the guidelines. It says the underwriting criteria described in this section of the PROSOP, which is quite different. I might add here, and I think this is of huge importance, that among the caveats and disclaimers were expressed statements in all seven of the PROSOPs that exceptions to the guidelines had been made in the professional judgment of the underwriter based on compensating factors. Three of the PROSOPs said that a substantial portion of the loans represent or, in one case, may represent exceptions. Hunter testified that he applied a much stricter standard, and the court adopted it. He acknowledged that what the PROSOPs disclosed was a very lenient approach to underwriting guidelines. Judge Cote, in her post-trial opinion, makes reference along the way to the fact that at the time, 2005 to 2007, it was well understood in the industry that exceptions were granted on a lenient basis. Hunter did none of that. He applied a much tougher standard than the one that the PROSOP represented was being adopted in this case. He didn't evaluate the reasonableness of the underwriter's judgment, but substituted his own, and he was clear about that on cross-examination. That's not evaluating for falsity disclosures in the PROSOPs. That's changing them, and that's exactly what the district court said she was doing. When it comes to the PROSOP where Resme was the originator of 77% of the loans, the PROSOP has a specific warning that because Resme had recently gone into bankruptcy, the loans may not have been underwritten in accordance with the guidelines. And if you'll forgive one of the words in the next sentence, what the court said was that specific disclosure was trumped by the general reassurance that loans generally complied with guidelines. Mr. Tolchin, you reserved some rebuttal time. Would you like to use some now? As I said at the start of court today, we're complying with the light today to get all of our calendar taken care of. Judge Livingston, if it's all right with you, I'd like to use one minute of it right now. I'll use six. Go ahead. I'll be six-six, Judge Bessel. On loss causation, the district court adopted a standard that has never been used, that is not found in the statutory language or in any decisional law. She said that if the conducted issue was related in some way to the phenomena that caused the housing crisis, that these defendants were entitled not at all to invoke the loss causation defense. So what? Let me ask you, so what, though? Your expert said that none of this had any cause on the losses. He said any losses attributed to the certificates were caused only by the market factors, not by any of these failure to follow the underwriting guidelines, the appraisals. It was all because of general national problems. And Judge Droney— How does it make a difference? Freddie, it makes a difference because that's 100 percent, Your Honor, attributable to factors other than the alleged false statements. And, of course, Freddie and Fannie themselves made the same representation to courts and the Securities and Exchange Commission that their losses on private label securities exactly of this sort were caused 100 percent by macroeconomic factors. What did he use for a control? What did he use to make that measurement between the bad loans in these certificates and good loans? He had four benchmarking analyses, three of which were excluded, and as we point out in our brief, wrongly excluded. The one that was in evidence compared the loans that Mr. Hunter had found to be defective with those in these securitizations that Hunter never said were defective. Of course, he had every incentive to do so. And in that benchmarking analysis, the difference in losses on those two groups of securities was zero. 100 percent could be attributed to the decline in the housing market and not at all to any alleged false statements. I appreciate your time. Thank you. Good morning, Your Honors. May it please the Court. Josh Rosenkranz representing RBS. Your Honors, Mr. Tolchin covered some of the trial errors in this case and errors in the district court's trial opinion. I'd like to back up and talk about some of the issues that the district court decided really remarkably on summary judgment without trial. Issues like what did Fannie and Freddie know? Could Fannie and Freddie have discovered their claim earlier with reasonable diligence? Did we exercise reasonable care when we complied with industry standards? Now, these are the sorts of issues on which summary judgment is just not appropriate. In fact, we haven't found a single case in which this Court has ever affirmed summary judgment on knowledge or on reasonable care, and it should not have been granted here. So let's start with knowledge. No one knew more about the mortgage market than Fannie and Freddie, but I'm not making a generalized knowledge point. To Judge Wesley's question, Fannie and Freddie knew about the quality of the loans that were heading directly into these securitizations, and I get there in two steps. Step one. Before you go there, and I think I know where you're going, what's wrong with the analogy that another district court used with regard to the car lot? Because that seems fairly apt. What we're really talking about is maybe they had a lot of generalized knowledge about problems with loans. Generally, maybe they even knew something about specific originators, but your client was in the position of making representations, and if the dealer on the car lot says, I know a lot of these cars have bad brake lights, but look, I've looked into these, and these are going to be very good, at least generally very good. Your Honor, so the analogy breaks down, and I'll offer a counter analogy in a moment. The analogy breaks down at two levels. One is the analogy of the taxi company being generally aware. That's not this case. Freddie and Fannie knew about these originators. They knew about the loans that were defective. These specific ones? These specific originators, which gets me to the- Oh, no, these specific loans. These specific loans, yes, and I'll tell you how I get to the second step. I need to know exactly in the record where you get that proof. So S- Excuse me, I haven't been able to find it. SPA 385, the district court summarizes the evidence. So Fannie and Freddie knew that the originators were producing defective loans. They knew this in chapter and verse. SPA 385 has the district court summarizing the key piece of evidence on this and the evidence that makes this an easy issue. It was testimony from Freddie's PLS portfolio head. So this is the guy, Freddie, who's responsible for deciding whether to purchase the certificates. He testifies, I'll quote it now directly, If an originator was not following its own guidelines and was contributing loans to the collateral for the pool, Freddie would expect that loans not underwritten to the originator's guidelines would end up in the collateral for the pool. So let me translate. In other words, when you draw from a source with a high level of defects, you are going to naturally end up with a higher concentration of defective loans in the final pool. So the better analogy is you've got a water treatment facility on the Hudson River. The buyer who wants to buy water safe in tanks for irrigation knows that in the Hudson River there's 1,000 particles per billion of sediment. What you want is 100 particles per billion, and it understands exactly what the filtering process is. They use filter number 10 to weed out 90%. So you're still left with 100%. When it hears this is pure drinking water, there's not a single part per billion of sediment, the buyer knows that that is wrong. And by the way, even if you don't accept this evidence, this court has said numerous times, most notably in IPO, that is in-ray IPO, which FIFA does not even respond to, that you don't have to have a direct link from the general evidence to the specific. A long line of cases holds that you can prove specific knowledge, even with evidence of what was generally known in the marketplace. Now let me transition. The fact that they would know that a particular originator might have a disproportionate number of its loans becoming bad, what does that say, though, about the representation that was made by Nomura and your clients that, indeed, generally these loans were in compliance with regard to the originators? I mean, the fact that they may have had a suspicion or concern pursuant to the trust documents, you had the right to reject loans that you thought were noncompliant and require them to be replaced by compliance loans. That's part of how the whole tax structure works, too, with these things. So couldn't Fannie and Freddie rely upon the fact that you would do your job and look for the bad loans before you put them into the marketplace? So two answers, Your Honor. The state of the market was that everybody knew they were lousy, so they all just sold them anyhow. Is that it? No, Your Honor, two answers. That's the industry standard. No, Your Honor, two answers. The first is Fannie and Freddie, and particularly the evidence here on Freddie, they knew what our diligence practices were as well. They analyzed our diligence practices in 2004 and 2006. They were satisfied with the number 10 filter. They knew that there were loans that were defective going through. They knew we were not doing 100% review, but we were sampling. Did they know that your folks were getting spreadsheets on the loans and not even taking a look at them? Did they know that? They knew what our practices were. Did they know that? Your Honor, that's a facts question. It's a simple question. Did they know it? Does the record show that they knew it? Does the record show that they knew about an e-mail in the record that someone might construe that way? No. But this is summary judgment, Your Honor. What we're talking about is Where's the issue of fact about what they knew then? The issue of fact about what they knew about the loans that were not compliant. Excuse me. The loans that they knew were not compliant because your folks weren't doing their job. So the representation here that is being read into the PROSEP is a representation that every single loan that got into the pool, every loan, was a compliant loan except for material departures. Okay. Freddie and Fannie could not possibly have believed that that was true if that's in fact how they... The representation you made was so unbelievable that no one should believe it? Your Honor, our point, as Mr. Toulton explained... It's a bridge, I guess. The point, as Mr. Toulton explained, is we never made that representation precisely because no one would ever expect that representation. But I need to turn to statute of limitations. You were going to turn to the reasonable care issue now? I was going to turn to statute of limitations, if I may, Your Honor, but I'm happy to do reasonable... Could you just address reasonable care? Because the document that you alluded to are these two studies done in 2004 or 2006, not studies, but I guess audits, do seem to suggest that Fannie and Freddie had knowledge about the due diligence program, and wouldn't that create a fact issue or at least potentially create a fact issue as to whether your clients exercise reasonable care? If Fannie and Freddie thought they did, would that be some evidence that they did? Yes, of course. This is a fact question. This was resolved on summary judgment, Your Honor. The district court acknowledged that there was ample evidence that RBS and Nomura both applied the level of care that was industry standard. That should foreclose summary judgment. Now, FIFA can come in and try to prove that the entire industry was unreasonable, but that's not something you resolve on summary judgment. And then let me just turn to, because we've been talking a lot about knowledge, but statute of limitations goes hand in hand with knowledge. Even if you don't think our evidence of Fannie and Freddie here is sufficient to draw the link that they knew, to give rise to a reasonable inference that they knew that the falsity of what was represented was there, at a minimum what they knew and what they later learned over the course of the next two years put them on notice to ask questions. Perhaps the starkest evidence in this regard is the credit rating downgrades of several of the tranches, that is the junior tranches and four of the securitizations. Those tranches were backed by the same loans that backed the senior tranches. It's the same foundation. Now, a reasonable vesture who saw these downgrades in the lower tranches would ask himself, why is this happening? And when he asked, he learned, as the record reflects Fannie and Freddie's own witnesses confirmed, that the downgrades spoke to the quality of the same loans that undergirded the senior tranches. And they're the same loans with the same quality characteristics. They don't even have to know that. Moody's said it. Moody's explained the reason for its downgrade. The reason was, this is recited at SPA 420, that the underlying loans, quote, were originated in an environment of aggressive underwriting. And at a press conference, Moody's declares that the poor performance was due, quote, to certain misrepresentations called by the industry soft fraud like occupancy or stated income and appraisal inflation. So Moody's said, here's what the story is, put Fannie and Freddie on notice, and at least they could have pled a claim, and beyond that, by September of 2007, Fannie and Freddie knew that two-thirds of the originators disclosed in these procepts had either gone bankrupt or gone out of business. Now, why did that happen? Because they were accused of misrepresenting the quality of loans and, therefore, were forced to buy back the loans. There's a huge disconnect here, Your Honors, and it's really unfair. In denying the motion to dismiss for failure to state a claim, the district court relied on this very evidence to demonstrate that the procept's representations may have been inaccurate. It held, for example, that, quote, originators whose loans support the GSE certificates disregarded their own underwriting guidelines on a widespread and systematic basis. Well, if this evidence supported a plausible claim of falsity, then it also necessarily demonstrated that FIFA should have been on notice of the claims. Thank you, Your Honors. May it please the Court. Kathleen Sullivan for the Federal Housing Finance Agency. Your Honors, as you've just heard, RBS and Nomura would like to make this case all about the buyer, all about Fannie and Freddie and what they knew and what their idiosyncratic incentives were. But I'd like to bring us back to where we are. We're in a Section 12 case. Section 12 is all about the seller, not the buyer. Section 12 arose under the 1933 Act, the 1933 Securities Act, which was designed to make sure that we never again had the markets crash the way they had in 1929. And it put strict liability on sellers. It said everything you say in a prospectus sold to initial direct purchasers must be true. And if there's a material misrepresentation, the buyers get their purchase money back, end of case. Now, Your Honors, if we remember that we're in a Section 12 case, we're not in a lit-back. We're not in a criminal equivalent of 10b-5 or any of the Section 10 cases that come before us where, as Judge Livingston noted, buyer's reliance might be relevant. Section 12 does not require reliance. It does not require affirmative proof of causation. And it does not require C-enter. It's totally unlike Section 10. Your adversaries argue that's fine, but you have to have the misrepresentation. And what happened here is the district court, in effect, rewrote the procepts. Not so. I thought you would disagree with that. District court, to start with the – remember, we win on falsity. Falsity is an issue decided at trial. As my friends on the other side neglected to mention, the standard is clear error and abuse of discretion for every issue here. But even if you look at the precepts under de novo review, the plain text, as Judge Livingston, you already described, clearly says that we represent that these securities are – the representations in the securities are that the underlying collateral loans generally accorded with underwriting guidelines. Now, the other side tries to get out of this by saying, oh, no, it's just referring to the guidelines described in this section. But that's not right. That's just an odd result because the guidelines in the section post-date the origination of the loans. So I suppose maybe it represents that they looked through all these loans and somehow decided that the loans complied with the guidelines that they then issued. That's exactly right, Your Honor. This is a back-to-the-future problem. You can't say in your precept that the underlying loans we gathered from the banks were originated, past tense, generally in accordance with underwriting criteria described in this section. How could they have been originated with something that didn't exist yet, the prosop? So, Your Honor, as to both the unnamed and the named originators, the representation as to underwriting guidelines was general compliance. Now, the notion that you can have general compliance where there's wholesale abandonment of the guidelines is untenable. But remember, we went on falsity whether you affirm on any of the three grounds the judge found after bench trial. Noncompliance with underwriting guidelines, misrepresentations as to loan-to-value ratios because of insulated appraisals, or misrepresentation of the credit ratings based on false data. So we went on any of those. But on the underwriting guidelines, this should be dispositive. And don't take it from me. Take it from Nomura's own witness, Mr. Graham. If you go to the record on page A6299, he testifies that, of course, we were looking to the origination guidelines. When we did our indirect comparison, we looked to the origination guidelines. And you'd expect that because the regulation, Regulation AB, regulation asset-backed securities issued by the SEC to handle RMBS, requires the PROCEPs to describe, quote, underwriting criteria used to originate the pool assets. So with respect, this whole idea that it wasn't really the originators' guidelines that are being ripped and warrantied to, it was something described in the PROCEP, is a post hoc litigation invention that bears no relation to the practice of the industry. In fact, the industry understood that original origination guidelines were what was referred to, and frankly, defendants understood it. They put us at trial through endless rounds of discovery in which we had to match specific loans to specific originators' guidelines. Years of discovery we wouldn't have to go through if the post hoc story were right. But, Your Honor, I'm spending a lot of time on falsity. I think that's an easy affirmance for you because there are three different bases on which you can affirm the bench trial, and the standard of review is clear error, and there was no clear error here. The district court meticulously assessed the record. She both resolved credibility disputes between the experts, which can't be overturned here, and to the extent she did her own loan-by-loan review, confirming that she believed more of our experts than theirs, defendants remarkably fault her for doing that. But in our system of justice, judges make decisions. Experts don't tell them what to do. So falsity, I think, is an easy case. If I could return to some of the summary judgment issues, Your Honor. Yes. If you could address the reasonable care issue, I would particularly like to hear about that. Absolutely, Your Honor. So reasonable care, remember, is an affirmative defense. Section 12 puts the burden on defendants to prove that they exercised reasonable care. And I know it seems a little odd at first to say we're going to decide reasonable care at summary judgment as a matter of law. But that isn't just Judge Coates' approach. It goes back to Justice Holmes. Justice Holmes told us that if we know that it would lack reasonable care not to look both ways at a railroad crossing, a judge can hold that that was a lack of reasonable care as a matter of law. So we're, as in this case, there are undisputed facts showing a lack of reasonable care. It was appropriate to decide at summary judgment. And, Your Honor, since my friend, Mr. Rosenkranz, put us to the challenge where he said there's never been a case in which this Court has ever affirmed a summary judgment granting lack of reasonable care, I respectfully direct the Court to Inree Levent at 161 Federal Appendix 116, in which this Court did just that, affirming summary judgment for the plaintiff in a state blue sky case for failure to show reasonable care. Now, Your Honor, let me go through reasonable care and show you why you must affirm, even though it's summary judgment. There were six separate pillars on which the District Court found lack of reasonable care. Let me tick them off, and then I'm going to show you how defendants have barely made a half swing at only two of them. The District Court said there was no diligence at the time of securitization. And, Judge Wesley, this goes back to your point. This is not a case about representations about the loans. This is a case about representations in securities. And the securities are backed by the loans. But what is being sold is the security. And my friends lose sight of that when they drag you back into the world of the origination of the loans. What's at issue here is was there reasonable care in securitizing the loans and making the special reps and warranties that we paid a premium to have from this learned financial intermediary that was going to save us from market forces. So the first one is it is undisputed there was no diligence at the time of securitization. Don't take it from me. Take it again from Mr. Graham, Nomura's witness, at page A2516 of the record and multiple other places. He admitted in the summary judgment record that there was no further diligence performed at the time of securitization. That's almost enough right there to decide the case on reasonable care, but there's five more. Going to acquisition level diligence, the district court found there was flawed nonrandom sampling acquisition, sampling at acquisition, flawed nonrandom, nonindustry standard sampling at acquisition. Again, this is all based on admissions from their witnesses. Nomura's Mr. Coho at 2631-233 said this was a nonindustry standard approach. It's undisputed, third pillar, that there were missed effective loans at acquisition. Nomura's own audit at page A2370 showed that 30 percent of loans rated passing under EV1 or 2 grades had to be reclassified as actually EV3. So there was missed at acquisition, no diligence at securitization, bad sampling at acquisition, missed defects at acquisition. There were high defect rates in the acquisition level sampling. There were kickout rates of 15.2 percent. Their own witnesses admitted that was double the normal. And fifth pillar, the defendants ignored red flags. Their colorful statements tell you all you need to know about missing red flags. If you look at page A2886-288, you'll find an email exchange in which the correspondence among the defendants says, shouldn't we increase the sample size because the loans we have are crap? It's not our pool. It's not our pool. Reasonable care is an objective standard, and it's measured by what a prudent person would do if they were working with their own money. It doesn't satisfy that standard to say we don't need to increase the sample size to deal with crap because it's not our loan pool. Or if you look at page A2906, you'll see one of RBS's executives calling Fremont one of the originators, Fraudmont. They ignored red flags, crap, Fraudmont, no response. And fifth, they didn't verify the representations in the securities were accurate after the fact. Now, you can look at the briefs, the blue briefs and the gray briefs, and you're going to find only two facts there that defendants even try to dispute. First, they try to dispute, oh, well, was 15 percent really too high a kickout rate? Isn't that factual? No, because, as Judge Cote noted, no more is own witness admitted that the 12 percent kickout rates that were being experienced were higher than normal. That's at A10540. And the other thing they take, so they take a half swing at red flags, and they don't even connect. Then they take a swing at the idea that there was no verification that the representations were accurate in the securities themselves, but their own diligence people admitted that they never reviewed the process. In fact, Mr. Graham, no more as Mr. Graham said, he never asked the diligence folks if the underwriting compliance representation was true. That's at 2466. So your argument is that whatever Freddie may at one point have opined about what it believed with regard to Nomura's due diligence practices, the evidence was overwhelming so that no reasonable jury could find reasonable care, and it does seem to be substantial evidence in this record as to a lack of care. That's exactly right, Your Honor. And if ever there was an issue that would be futile to remand for trial, it's this one, because at bench trial the district court made repeated findings of defendants' admissions of their lack of due diligence, their excessive kickout rates, their ignoring red flags. So no remand on reasonable cares. Does it matter if the evidence might have shown that you could, that Fannie or Freddie could have known about the inadequacies of the due diligence on the part of Nomura and Arbius? No, Your Honor, because again I want to come back to Section 12. This is not a case where we have any duties of investigation, or when Fannie and Freddie had any duties of investigation. Section 12 says the baseline is truth. What the seller reps is truth. We bought a product. Remember, we bought a specific security that was specifically repped and warrantied to have very specific representations in it. These are highly specific representations. They're not generally vaguely in accordance with some standard. This is not more than 79.58 percent of the loans have a greater than 80 percent loan-to-value ratio, not more than 42.8 percent of the homes were not owner-occupied. These are highly specific representations, as Judge Droney pointed out before. So, Your Honor, there is no evidence in the record that Fannie and Freddie had reason to know that those particular representations in the securities were false. Now, if I could, I'd like to follow and go to the knowledge point, because my friends on the other side said, well, there shouldn't have been summary judgment on plaintiff's lack of knowledge of falsity. Now, that again is a summary judgment issue. It was our burden. But we satisfied it at summary judgment. First, it's undisputed that Fannie and Freddie had no access to loan-level documents. Second, defendants had 29 depositions over 46 days and received 19 million pages of documents, and they were unable to find a single admission that Fannie and Freddie knew of the specific misrepresentations in the documents. And, in fact, of course, Fannie and Freddie went to the PLS market, the private-label securities market, to buy specially packaged loan groups. They paid a premium to get selected loan groups as collateral. And, Judge Livingston, you hit the nail on the head when you cited Judge Thompson's taxi analogy. It's exactly apt. It is not the case that, as Judge Wesley, as you pointed out, general knowledge about loan origination out in the loan market can lead to an inference of specific knowledge of misrepresentation in the securities reps and warranties, which are very specific. The legal standard must be specific. And if the taxi analogy isn't enough, your own recent... Specific representations as to loan-to-value ratios, the specific representation as to underwriting guidelines. We had every reason to rely on their representation. Fannie and Freddie had looked at Nomura's due diligence and they have proof. Have they not? Well, Your Honor, there's a difference between due diligence and the different markets. We bought in these seven securities with specific reps and warranties, and there's no evidence in the record. My friend cited you to A385. What you'll find on that page is pure speculation. There's no fact in the record to show that we knew about any diligence failures. So if I could just summarize on the lack of knowledge. The key here is don't let them lure you into comparing apples to oranges. Anything that Fannie and Freddie might have known about underwriting difficulties in the loan origination market is irrelevant, as Judge Thompson correctly held, to specific knowledge of specific misrepresentations as to these specific reps and warranties. They raised a discovery issue. They said if we could have had more discovery, we might have been able to come up with evidence of knowledge. Your Honor, they had 46. Collectively, the defendants had 46 days of 29 depositions, and they didn't come up with anything. They would have to have come up with something specific, and they failed. They had ample opportunity, and they failed. And again, that's abuse of discretion and no grounds for reversal. If I could quickly touch on Mr. Rosenkranz's argument about notice, there's no issue on statute of limitations warranting your remand. There is no court that has ever held there was notice by September of 2007, the relevant date, of defects in RMBS representations. The senior tranches were not downgraded until 2008, and there's no reason to suppose because the junior tranche is downgraded that there's problems in the senior tranche. In fact, in July of 2008, the senior tranches were – the credit ratings were reapproved, reaffirmed, so that we had every reason to rely. And we could never, even if we knew about a storm warning in July of 2007, have done the investigation required to bring a fraud claim by September 2008. Your Honor. Could you talk about loss causation, too, in the Vandell testimony? Yes, Your Honor. And I note that my colleagues on the other side were given six minutes more to start, and they took about 10 minutes more between them. Will I have any extra time? Yes. If we ask questions, you will be able to answer them, and I expect we have a question. Thank you very much, Your Honor. I appreciate the extra time. Judge Joni, let me address the loss causation issue in the Vandell cratering. You identified the issue exactly. Let me start, if I could, with a reminder of the legal standard. Again, we're not in 10B. We don't have to prove causation. The defendants have to prove negative loss causation. And I think Judge Cote exactly anticipated this Court's decision in the Lorelei case, in which this Court used an analogy that's really perfect for our case. In Lorelei, the Court said that it may be enough at the pleading stage for a plaintiff to allege that a representation, I'm selling you a well-built house, and then the house is destroyed in an earthquake. That's enough at the pleading stage. But importantly, the next sentence of the opinion said, it then falls to the defendant to proffer facts indicating that a well-built house, or even an earthquake-proof one, would have been destroyed in an earthquake. If I rep it's a well-built house, and then you say, so what can I do? There was an earthquake. It fell down. Judge Calabresi's decision for the Court says, this is what the defendant has to do. You have to show the house would have fallen down in the earthquake, even if it had been well-built, which was your representation. This is exactly that case. In other words, what the defendants needed to prove is that these securities would have lost value, even if they had truthfully disclosed all the defective loans that were noncompliant with underwriting guidelines. Even if they had truthfully disclosed the number of houses that were actually underwater on their LTVs. Even if they had been truthful about the well-built house, it would have collapsed anyway. And they utterly failed to meet that burden. And Judge Droney, you've already identified the problem. Vandell, the defendants came up with one expert to show the house would have fallen down in the earthquake, even if it had been well-built. And that was Vandell. And he spectacularly cratered at the trial, to the point where the District Court rightly said, at Special Appendix 225, that he was eviscerated. Precisely because he lacked an appropriate control group. Precisely because he hadn't included prepayment loans in the control group, prepaid loans in the control group. Why not consider the Hunter loans, though, as your opponent has said? Why isn't that a sufficient control group? The Hunter loans? Yeah. Well, then, it was the defendant's obligation to prove. No, but that's what they just said this morning, is he had a control group. It was the Hunter loans. He didn't use it. The one he used was the wrong one. And he said, you know, memorably at trial, that may be what it says, but that's not what it means. So they can't come in and rehabilitate his testimony now with something he didn't look to at trial. I would respectfully suggest there's no ground for remand there. The loss causation, you know, independently, we think that, you know, the FGIC footnote 2 point that, you know, if in a 10b-5 case you can't disaggregate or disentangle macroeconomic causes from the causes of the specific representation, you have a problem with causation. If you flip the burden, which Section 12 does, the exact same thing applies in reverse. You can't disentangle defendant's responsibility for our losses from macroeconomic situations. So we went on either Loralee or FGIC footnote 2. And, Your Honor, as to my friend Mr. Tulchin's suggestion, well, we were so little, we didn't cause the whole collapse. That's not the question. The question is not whether their misrepresentations were de minimis relative to the entire crash of the economy as a result of RMBS fraud. The question is whether their misrepresentations can be disproved as the cause of our losses. And they are highly relative. They're not de minimis relative to us. The argument is that when they have the burden, that may be a problem. They have the burden of disentangling, the burden of showing that there was a lack of loss causation. That's right. And that's the problem. And they can't overcome it. It could be the plaintiff's burden in another case, but in this one it's theirs. That's exactly right, Your Honor. And, again, it goes back to the fundamental point. You know, I fear my friend's problem is not with FHFA. It's with FDR. We have Section 12, strict liability for sellers, requirement of honesty, requirement of disclosure of truth, and a rescissionary remedy if there's not a truth. And so when the burdens are shifted, Your Honor, you're exactly right. Loss causation was their burden, and they can't meet it here because they can't disentangle. But we also think that if they couldn't come up with better than Vandell at trial, they shouldn't get a second chance now. I realize you pointed out at the start of your argument that there are multiple paths of misrepresentation here. But could you address the appraisal question for just a minute and the argument that these GAVMs, because they use tax assessed value, over relied on it, that the GAVM was an unreliable methodology? I'd be happy to, Your Honor. So let me begin with the GAVM. First of all, there's no dispute here on the legal standard that falsity as to LTV is falsity as to an opinion. So there has to be both objective and subjective falsity. We think that to try to pick little holes in Kilpatrick's testimony is not going to suffice to reverse the district court's holding on a clear error standard, and here's why. First of all, AVMs are standard industry practice. We have admissions from, you know, Morazone witnesses to that effect. And the fact that Kilpatrick created a GAVM, they like to make a lot of fun of that, why didn't he use a commercial off-the-shelf version? And the answer is because by creating his own inputs, he could make it more verifiable, more testable, and thus more reliable for deliberate purposes at trial. So he should be credited, not faulted for that. And again, we built almost our entire argument on defendant's admissions. I've given you a parade of defendant's admissions, and here's another one. The defendant's own expert, Mr. Kennedy, admitted that the GAVM outperformed industry AVMs. That's at A5701203. In any event, any objections to the use of tax assessed valuations or anything else goes to weight, not credibility, and sorry, to weight, not admissibility. And the credibility determinations the district court made about Kilpatrick versus the contrary experts should be upheld on clear or abuse of discretion review for its admission. Now, it wasn't just reliance on the GAVM. The district court relied also on the subjective part of Kilpatrick's analysis. And again, my friends like to poke a lot of fun at the CAM, the credibility assessment model. But even though it is not an industry standard like an AVM, it is based on the USTAP, the standardized practices of the appraisal experts. And there's 31 questions that are derived exactly from USPAP, as it's called, USPAP. So there was an issue of reliability there. And again, defendant's own appraisal expert admitted that the questions in the CAM went to credibility. That's at A5688. Again, the district court did her own loan-by-loan review, Your Honor. So you've got the CAM checks the AVM. And the district court checked both. She did her own loan-by-loan review. And she didn't always just agree wholesale with Mr. Kilpatrick. After she did her review of the loans that were kicked out of the GAVM into the CAM, she said, well, I find 87 percent of them not credible. He said 92. So she's doing a separate analysis that provides a check, and it can't be overturned on clear error review. But, Your Honor, even if you disregarded the CAM, even if you had any problem with it, there's independent evidence that not only corroborated the CAM, but independently suffices to show subjective falsity. You had the petition evidence, the remarkable petition evidence at A6687, the petitioner's – I'm sorry, the appraiser's survey at A6732. And you had – even if you think that's hearsay, you don't want to pay attention to the petition and the survey – you have defendant's own appraiser witnesses who on the stand at trial said that they'd been pressured to inflate the appraisals. And, Your Honor, it was perfectly permissible for the district court also to find all of that evidence, the CAM as to direct evidence, the pressure to inflate evidence as circumstantial evidence corroborating it. There's additional circumstantial evidence corroborating it, and that's that all the false appraisals moved only in one direction. All you ever find here is overvaluation. You never find undervaluation. That doesn't happen in a game of chance. If it's always moving in one direction, it's not coincidental. And so there was – even without the CAM, you've got evidence. And last, you know, you've got the fact that the district court deems suspicious that 32 percent of the purchase money loans had appraisals that just happened to exactly match the sale price, which, again, wouldn't happen in nature. So, Your Honor, we think that falsity is an easy case for affirmance. If you have any problems with the underwriting guidelines, it's sufficient to affirm on loan-to-value falsity and vice versa. And, by the way, the credit ratings is an independent ground, too. It's not just derivative from the other two because Hunter testified without contradiction. Our expert, Hunter, testified without contradiction that data in the tapes sent to Moody's and Standard & Poor's was itself false. Forget about whether it was compliant. It was false as to how many houses were owner-occupied and so forth. Your Honor, we've covered a lot of issues. I hope I've convinced you you don't need to reverse any of the summary judgment rulings on knowledge, notice, or reasonable care. We've covered falsity. If I could say a brief word about materiality, if that won't tax your patience too much. I'll give you a few – 30 seconds. Last minute – no, go ahead. Take two minutes because you started with fewer minutes than your adversaries total in the original scheduling order. Thank you, Your Honor. I'd like to go back to materiality because, again, what defendants want you to do is look at the buyer and not the seller. Section 12 is all about the seller. Did the seller tell the truth? And under Section 12, basically, materiality, as Judge Livingston, as you said, it's an objective standard. Was it material to a reasonable investor? And unlike Section 10 where reliance is an issue, we don't vary what a reasonable investor might think based on the idiosyncratic nature of a particular buyer. We don't do that. We don't try. It's about not misrepresenting a security prospectus, not putting misrepresentations in a security prospectus no matter who buys it. So live back is irrelevant. On materiality, the reason you should affirm, again, on clear error review is it's not even close that this falsity was material to a reasonable investor. Just starting with the quantitative point, we know that 5% deviation from material credit characteristics is a good presumptive benchmark for materiality. How do we know that? Because the SEC told us. This Court's Bilzerian decision that says that when the SEC rules mandate disclosure, there's a good ground to presume that the thing forced to be disclosed is material. And Reg A.B. says that you must disclose deviations from material credit characteristics in an AK report if they're more than 5%. Well, this case blows that out of the water because the ranges the district court found, and that you should affirm on clear error review, were that the underwriting deviations were 45% to 59% of the loans in each SLG, in each loan group. And the LTV falsity infected 18% to 36% of the loans. That's a lot higher than 5%. I don't think we need to argue about how much water constitutes a drizzle when we're in a hurricane. And finally, on the qualitative points, even defendants' own witnesses admitted that underwriting guidelines compliance and loan-to-value ratios are very important to reasonable investors. Why? Because they predict likelihood of payment versus default. They predict they're good at telling you whether your loans are worthy collateral for the securities. Your Honor, on bench trial, we trust we've persuaded you in the letter brief that Section 12 is an equitable rescissionary remedy. At common law, equitable rescissionary remedies like Section 12 didn't need to have scienter, causation, or reliance. That nothing in the amendments under the PLSRA changed that because of key language in Section 12 still says amount recoverable. It doesn't say damages as in Section 11. And equity would be very happy that Congress said we'll restore both parties to the status quo ante. We're not going to allow a windfall to plaintiffs that they get a little extra from stuff that wasn't caused by defendants' misrepresentations. So if anything, PLSRA perfects it as an equitable remedy. And you should affirm, not send anything back, bench trial was proper, clear error on the bench trial issues, and affirmance on the summary judgment issues. If there are no further questions, thank you very much. Your Honors, may it please the Court, just a few very quick points. First on the jury trial issue, one thing that FHFA has never done is to answer the point that as to the non-underwriter defendants, there is no restitution possible. They didn't receive any money. They can't give it back. A jury trial was stripped away from all defendants. And of course, if some were entitled to it, all were. Further, the loss causation amendment in the PSLRA of 1995 makes absolutely clear that this isn't true rescission. We have a statutory formula for damages modified by the affirmative defense of loss causation. Secondly, on materiality, what my adversary failed to do was to address Judge Coates' test, which she took from the pro sups. She said, the district court said, that the test of materiality can be found in the 5% disclosure in the pro sups. No court has ever done anything similar. In fact, Judge Droney wrote in 2008, when you were on the district court, Your Honor, in Connecticut, United States against Ferguson, 553F sub 2nd at 152, that there is no bright line test for materiality. That the Second Circuit has consistently rejected such a test, citing Ganino against citizens from the year 2000, written by Judge Katzman. Materiality, of course, depends in a section 12 test on the identity of the buyer. That is the central teaching of Delta Holdings against National Distillers, a decision that came down 25 years ago and written by Judge Feinberg. Materiality in a section 12 case, which that was, depends upon context, just as Omnicare said, just as Litvack says. It depends upon the identity of the purchaser. The test is a reasonable investor in the shoes of the buyer, and a purchaser with the sophistication of the plaintiff. So while it's nice to point to section 12 as strict liability and Franklin Roosevelt, the truth is that the standard for materiality was not applied here. And the evidence that the defendants proffered on the importance of these disclosures, which neither Freddie nor Fannie Fannie ever had at the time they made the decision to buy. They had never seen them. All the evidence we proffered was rejected as irrelevant because of the district court's holding, which she repeats in her post-trial decision, that the identity of the plaintiff is irrelevant. Litvack makes that clearly wrong. Delta Holdings from 1991 did as well. On loss causation, I'll be brief. Again. I'll say one minute. Thank you, Your Honor. I very much appreciate it. On loss causation, the wrong standard was used. There's no basis in the statute to say that if the conduct is related in some way to the phenomena that caused the macroeconomic event, that the defendant is stripped of the loss causation defense. And again, the evidence we offered for the most part was rejected. It wasn't just Dr. Vandell and his benchmarking analyses, three of which were excluded because the district court relied on the FCIC report, the Financial Crisis Inquiry Commission report. The district court rejected Vandell's standards on the ground that that report, which the court candidly said had never even been offered into evidence, and the contents of which are not subject to judicial notice, that report showed that the whole industry was tainted, as if the loss causation defense can be stripped away from a particular defendant based on the conduct of others. Nomura is never even mentioned in that 600-page report. And finally, on loss causation. I think your minute has expired. Thank you, Your Honors. Thank you for your argument. We very much appreciate your patience. Thank you all. There's just a couple of points. Excuse me. First, Section 12 is not only about the sellers. There's a lack of knowledge element to it. That's about the buyers. Excuse me. Yes, that is about the buyers. Now, knowledge is not a matter of de novo review, as Ms. Sullivan acknowledges. It's a fact question, but the district court decided it on summary judgment. I want to focus a bit on diligence. Again, this was summary judgment. Ms. Sullivan hasn't disputed our central point here. You do not declare that an entire industry was unreasonable, and Ms. Sullivan does not dispute that we have evidence that the industry, that our practices here on diligence were industry standard. You don't declare that an entire industry was unreasonable on summary judgment. They can try to prove that, but you can't declare it up front. And here's some examples of why. Ms. Sullivan points out no due diligence at the time of securitization. No one was doing due diligence twice. Why was there no due diligence the second time? Go back to the water treatment analogy. The water is coming out of the pipes. It's tested at the factory. It doesn't change later on, and the representations in the process were about origination. So what did this look like at origination? The loans aren't changing their character at the point of securitization. Bad sampling, missed defects, red flags, classic fact questions. I'm not going to go into all of them. But let me just give, take one example, red flags, classic fact question. We know it because FIFA's own experts said this is intensely fact specific. Most of the facts that my colleague has pointed to are facts that arose after these securitizations. Fraudmont, for example, was an email later. The 7% to 8% number, that was an email, and it's apples and oranges anyway. Our 15% kickout number that my colleague has pointed to was a number that was drawn from the 40% worst loans, and we were checking the worst loans. It's called adverse sampling. So, of course, the kickout rate would be higher. To address Ms. Sullivan's point on the futility of going back to the district court, that is so unfair. The district court took diligence out of the case, decided it on summary judgment, then gratuitously made findings against us on diligence. We did not present our diligence case. We did not present a single witness. And one just- It wouldn't be futile because at a bench trial there would be an entirely different case if you were presenting it. Yes, Your Honor. And, again, we did not affirmatively present a single diligence witness. That is, RBS did not. One last point, this disentanglement point on loss causation. We do not have to disentangle causes unless there's evidence that the other cause was a substantial cause. That is, so everyone agrees the housing crisis caused these losses. If FIFA comes in and says, well, no, no, no, RBS and Nomura caused a piece of it, there is not a piece of evidence saying that we caused it. The only thing that the district court found was that we were not unrelated to a phenomenon that may or may not have caused it. Now, this theory of touching upon touching upon is just an extraction or an extension of the theory that the Supreme Court has already rejected. This touching on, you need a substantial cause. The most that FIFA's expert was ever able to say was that he could not say that this was anything, our actions were anything but a de minimis cause. We don't have to assess the amount of a de minimis cause. A de minimis cause is, by definition, not substantial. If there are no further questions, I thank the court for its attention, and I request that the court reverse the district court's ruling. Thank you all. Extremely well argued, and thank you for the supplemental briefing on the jury trial question.